Lawrence M. Rolnick (LR-0546)
LOWENSTEIN SANDLER PC
Attorneys At Law
65 Livingston Avenue
Roseland, New Jersey 07068
973.597.2500
Attorneys for Plaintiffs
    Special Situations Fund, III, L.P. and
    Special Situations Cayman Fund

**FILED**

JUN 27 2002

AT 8:30................
WILLIAM T. WALSH
CLERK

RECEIVED-CLERK
U.S. DISTRICT COURT

2002 JUN 27  A 11: 52

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

SPECIAL SITUATIONS FUND, III, L.P., and
SPECIAL SITUATIONS CAYMAN FUND,
L.P.,

              Plaintiffs,

v.

MARK COCCHIOLA, STEVEN
VENECHANOS, MARCO COCCHIOLA,
RUDOLPH ACOSTA, PAUL DeSOCIO,
BARRY RUTCOFSKY, BDO SEIDMAN LLP,
JANNEY MONTGOMERY SCOTT LLC,
ROTH CAPITAL PARTNERS LLC, and
PACIFIC GROWTH EQUITIES,

              Defendants.

Civil Action No. 02CV 3099 (WHW)

### COMPLAINT AND
### DEMAND FOR JURY TRIAL

## INTRODUCTION

        Plaintiffs, by their undersigned attorneys, alleging upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters, based upon, *inter alia,* the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents and news releases of Suprema Specialties, Inc. ("Suprema" or the "Company"), hereby complain against defendants as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action based upon purchases of the common stock of Suprema between August 25, 2000 and November 14, 2001 to recover damages caused by defendants' violations of the federal securities laws and the common law of the State of New Jersey.

2.      Prior to and throughout this time period, defendants issued to the investing public a series of false and misleading financial statements and press releases concerning Suprema's financial results.

3.      In connection with the dissemination of this false information, on May 10, 2000, Suprema issued and, together with certain of its shareholders, offered for sale 1.10 million shares of Suprema common stock pursuant to a false and misleading registration statement, at approximately $8.82 a share, raising in excess of $9.7 million at the expense of the investing public.

4.      Again on August 25, 2000, Suprema issued and, together with certain of its shareholders, offered for sale an additional 1.20 million shares of Suprema common stock pursuant to a false and misleading registration statement, at approximately $8 a share, raising in excess of $9.6 million at the expense of the investing public.

5.      Again on September 17, 2001, Suprema issued and, together with certain of its shareholders, offered for sale an additional 4.05 million shares of Suprema common stock pursuant to a false and misleading registration statement, at approximately $12 a share, raising in excess of $48.03 million at the expense of the investing public.

6.      On November 20, 2001, Defendant Mark Cocchiola sold 154,386 shares of Suprema common stock at artificially inflated prices for total proceeds of approximately $1.83 million.

7.    On December 21, 2001, Suprema issued a press release that read, in pertinent part:

### Suprema Specialties, Inc., Announces Internal Investigation

PATERSON, N.J.--(BUSINESS WIRE)--Dec. 21, 2001--Suprema Specialties, Inc. (NASDAQ: CHEZ - news) announced today that following the resignations of its Chief Financial Officer and its controller, the Company has initiated an internal investigation of its prior reported financial results and has instructed its auditors to review the Company's financial records.

8.    In response to this revelation, Nasdaq halted all trading in Suprema stock and, on December 24, 2001, announced that trading would remain halted until Suprema has fully satisfied Nasdaq's request for additional information.

9.    On January 8, 2002, Suprema issued another press release announcing, in pertinent part:

### Suprema Specialties Provides Update On Internal Investigation

PATERSON, N.J.--(BUSINESS WIRE)--Jan. 8, 2002--Suprema Specialties, Inc. (Nasdaq: CHEZ - news) announced today an update regarding the internal investigation that the Company announced in its press release on December 21, 2001. The Company, with the assistance of its independent auditors, has continued to conduct an inquiry into the Company's financial records. Management's focus during this period has been on areas that it considers most material. The inquiry is not yet complete and, while it is not possible to predict the ultimate results of the inquiry, to date the Company has nothing to report. The Company and its Audit Committee are firmly committed to completing a thorough, expeditious inquiry of these matters.

10.    On January 25, 2002, Suprema issued yet another press release announcing in pertinent part:

> **Suprema Specialties, Inc. Provides Further Update On Internal Financial Inquiry**
>
> Paterson, NJ, January 25, 2002 - Suprema Specialties, Inc. (Nasdaq NMS: CHEZ) announced today the Company's Audit Committee is in the process of retaining Deloitte & Touche LLP to continue the investigation of the Company's financial statements and records. Mark Cocchiola, President and CEO said, "We are hopeful the work recently completed by the Company's independent auditors, together with the investigation to be conducted by Deloitte & Touche LLP, will help to bring closure to the inquiry. We are doing everything we can to bring this matter to a speedy conclusion. I appreciate our shareholders' patience while the Company works to resolve all issues."

11.    On February 4, 2002, Suprema announced that representatives of government agencies executed a search warrant at the Company's premises in Paterson, New Jersey and removed various corporate financial, manufacturing and other business records.

12.    On February 21, 2002, defendant Mark Cocchiola resigned as Chief Executive Officer, and Douglas Hopkins, a crisis manager from Nightingale and Associates, took over as the new Chief Executive Officer.

13.    Finally, on February 24, 2002, Suprema announced that it, along with its three operating subsidiaries, had filed a voluntary petition with the U.S. Bankruptcy Court in the Southern District of New York for reorganization under Chapter 11 of the U.S. Bankruptcy Code.

14.    As of March 1, 2002, shares of Suprema common stock were delisted by NASDAQ, and on March 20, 2002, Suprema's Chapter 11 reorganization was converted by the Bankruptcy Court Judge into a Chapter 7 liquidation.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l, and 77o, Sections 10(b), 13, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78r, and 78t(a), Rule 10b-5, 17 C.F.R. § 240. 10b-5 promulgated thereunder, and common law.

16.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act; 15 U.S.C. § 77v(a); Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1331.

17.     Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §§ 1391(b) and (c). The Company's corporate headquarters is in this District.  Many of the acts giving rise to the violations complained of herein, including the dissemination of false and misleading information, occurred and had their primary effects in this District.

18.     In connection with the acts, transactions and conduct alleged herein, defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of national securities exchanges and markets.

## THE PARTIES

19.     Plaintiffs Special Situations Fund, III, L.P. and Special Situations Fund Cayman, L.P. are investment partnerships that purchased 399,151 shares of Suprema common stock at artificially inflated prices at various times between August 25, 2000 and November 14, 2001.  Plaintiffs purchased certain of their Suprema shares in conjunction with the Company's August 25, 2000 and September 17, 2001, public stock offerings, and in reliance upon the public documents filed by Suprema and the Defendants in connection with those stock offerings.

20.     Suprema Specialties, Inc. (Nasdaq: CHEZ) maintains its principal executive offices at 510 East 35th Street, Paterson, New Jersey, 07543-0280.  The Company,

which was incorporated under the laws of the State of New York in August of 1983, manufactures, shreds, grates, and markets Italian variety cheeses. The Company also supplies cheeses to foodservice, retail, and food manufacturing companies and operates facilities in New Jersey, New York, California, and Idaho. Pursuant to false and misleading registration statements, which were filed with the Securities Exchange Commission ("SEC") on May 10, 2000, August 25, 2000, and September 17, 2001, the Company offered for sale 6.35 million additional shares of Suprema common stock to the investing public for total proceeds in excess of $66 million. Suprema is not named as a defendant in this action solely because of its pending bankruptcy.

21.    Defendant Mark Cocchiola ("Cocchiola") had been President and a director of the Company since he co-founded it in 1983. Cocchiola was named Chairman and Chief Executive Officer in February of 1991. Cocchiola made materially false and misleading statements in the Company's press releases and periodic reports, as detailed herein. Specifically, in an August 15, 2001 press release, Cocchiola attributed Suprema's "record" of 18 "consecutive quarter[s] of increased sales" to the Company's management and its growing market share when in fact the reported increases were the result of accounting fraud. In addition, in a November 15, 2001 press release, Cocchiola touted Suprema's inclusion in the list of Fortune Magazine's 100 Fastest Growing Companies, claiming that Suprema's rapid "quarter-by-quarter growth" was the result of the Company's performance; in fact the alleged growth was the product of accounting fraud. Cocchiola also signed the Company's false and misleading registration statements, which were filed on May 10, 2000, August 25, 2000, and September 17, 2001. Pursuant to the May 2000 registration statement, Cocchiola sold 50,000 shares of his Suprema common stock for proceeds of approximately $441,000. Pursuant to the August 2000 registration statement, Cocchiola sold 50,000 shares of his Suprema common stock for proceeds of approximately $368,000. Pursuant to the September 2001 registration statement, Cocchiola sold 193,423 shares of his Suprema common stock for proceeds of approximately $2.29 million and an additional 154,386 shares on the open market for proceeds of approximately $1.83 million.

22.    Defendant Steven Venechanos ("Venechanos") was the Company's Chief Financial Officer throughout the relevant time period. Venechanos signed the Company's false and misleading registration statements, which were filed on May 10, 2000, August 25, 2000, and September 17, 2001. Pursuant to the September 2001 registration statement, Venechanos sold 52,937 shares of his Suprema common stock for proceeds of approximately $627,833. Venechanos "resigned" on or about December 21, 2001. At the same time, the Company launched an internal investigation of its prior recorded financial results.

23.    Defendant Marco Cocchiola has been a director of Suprema since February of 1991 and Operations Manager since the Company's founding in 1983. Marco Cocchiola, who was Secretary of Suprema from February of 1991 to June of 1993, signed the Company's false and misleading registration statements, which were filed on May 10, 2000, August 25, 2000, and September 17, 2001.

24.    Defendant Rudolph Acosta, Jr., M.D. ("Acosta ") has been a director of Suprema since August of 1993. Acosta, who has also been engaged in the private practice of medicine since August 1986, signed the Company's false and misleading registration statements, which were filed on May 10, 2000, August 25, 2000, and September 17, 2001.

25.    Defendant Paul DeSocio ("DeSocio") has been a director of Suprema since August of 1993. DeSocio, who has also been the President and a director of Autoprod, Inc. since May 1989, signed the Company's false and misleading registration statements, which were filed on May 10, 2000, August 25, 2000, and September 17, 2001.

26.    Defendant Barry Rutcofsky ("Rutcofsky") has been a director of Suprema since February of 2001. Rutcofsky, who has also served as an Executive Vice-President of Take-Two Interactive Software, Inc. since May of 2001, signed the Company's false and misleading registration statement which was filed on September 17, 2001.

27.    The defendants listed in paragraphs 21 through 26 are referred to herein as the "Individual Defendants."

28.    BDO Seidman LLP ("BDO") is a Chicago-based accounting firm with offices located in Woodbridge, New Jersey.  BDO was Suprema's independent auditor and gave its approval to every financial statement released by Suprema for at the least the past five years.  Specifically, BDO explicitly consented to the use of its reports in the company's prospectus and financial reports as evidenced by a signed consent form attached to Suprema's financial documents.  On February 18, 2001, BDO quit the account, citing alleged concerns over the trustworthiness of information received from Suprema's management.

29.    Janney Montgomery Scott LLC is an investment banking firm headquartered in Philadelphia, Pennsylvania, with offices throughout New Jersey.  Janney Montgomery Scott was one of the three investment bankers for Suprema's secondary offering in September 2001.

30.    Roth Capital Partners LLC is an independent investment banking and brokerage firm that operates primarily in Southern California and was one of the three investment bankers for Suprema's secondary offering in September 2001.

31.    Pacific Growth Equities is an investment banking firm and was one of the three investment bankers for Suprema's secondary offering in September 2001.

32.    The defendants listed in paragraphs 29 through 31 are referred to herein as the "Investment Bankers".

33.    By reason of their positions with the Company, the Individual Defendants had access to internal Company documents, reports and other information, including adverse non-public information concerning the Company's services, financial condition, and future prospects.  The Individual Defendants also attended management and/or board of directors meetings.  As a result of their positions with the Company and their access to non-public information, the Individual Defendants were responsible for the truthfulness and accuracy of the Company's public reports and releases described herein.

34.    Suprema and the Individual Defendants, as officers and directors of a publicly held company, had a duty to promptly disseminate truthful and accurate information

with respect to Suprema and to promptly correct any public statements issued by or on behalf of the Company that had become false or misleading.

35. Each of the defendants knew or recklessly disregarded that the misleading statements and omissions complained of herein would be relied upon by potential purchasers of Suprema shares, like Plaintiffs, in formulating their decisions whether to invest. Each of the defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiffs.

36. Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.

## NO STATUTORY SAFE HARBOR

37. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pled in this complaint, because none of the statements pled herein were identified as "forward-looking statements" when made. Nor did meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the financial statements accompany the false statements at issue here.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

38. On May 10, 2000, the Company filed a Registration Statement on Form S-2, which announced that the Company was selling 1,000,000 shares of common stock to the public and that certain shaerholders were selling up to 100,000 shares. The Form S-2, which was amended on May 24, 2000 and July 24, 2000, was signed by Defendants Cocchiola, Venechanos, Marco Cocchiola, Acosta, and DeSocio. The May 10, 2000 Registration Statement expressly incorporated by reference the Company's annual report on Form 10-K filed on June 30, 1999, the

Company's quarterly reports on Form 10-Q filed on September 30 and December 31, 1999, and the Company's Proxy Statement filed on October 22, 1999.

39.     On May 12, 2000, Suprema announced record financial results for its third quarter and nine month sales in a press release that stated, in pertinent part:

**Suprema Specialties, Inc. Announces Record Third Quarter And Nine**

**Months Sales**

*65% Increase In Net Sales For Three Months To $75.6 Million*

*59% Increase In Net Sales For Nine Months To $202.3 Million*
Paterson, NJ, May 12, 2000 - Suprema Specialties, Inc. (NASDAQ NMS: CHEZ) announces net sales for the third quarter and nine months ended March 31, 2000.

Net sales for the third quarter ended March 31, 2000, increased 65% to approximately $75,564,000 as compared to approximately $45,863,000 for the same period in 1999. Net sales for the nine months ended March 31, 2000, increased 59% to approximately $202,268,000 as compared to approximately $127,414,000 for the same period in 1999.

The record third quarter net sales and the record nine months net sales reflect an increase in sales volume for food service products manufactured by the Company.

The Company will announce complete financial earnings on Monday, May 15, 2000.

40.     On August 25, 2000, the Company filed a Registration Statement on Form S-2, which announced that the Company was selling 1,100,000 shares of common stock to the public and that certain Company insiders were selling 100,000 shares. The Form S-2 was signed by Defendants Cocchiola, Venechanos, Marco Cocchiola, Acosta, and DeSocio, and it expressly incorporated by reference the Company's annual report on Form 10-K filed on June 30, 1999, the Company's quarterly reports on Form 10-Q filed on September 30 and December 31, 1999, and the Company's Proxy Statement filed on October 22, 1999.

41.    On August 8, 2001, Suprema announced record financial results for its fourth quarter and its fiscal year 2001 in a press release that stated, in pertinent part:

**Suprema Specialties, Inc. Announces Record Fourth Quarter and Fiscal Year 2001 Financial Results**

*71 % increase in fourth quarter net sales - $130 million in 2001 compared to $76 million in 2000*

*51 % increase in year-end net sales - $420 million in 2001 compared to $278 million in 2000*

*Paterson, NJ, August 8, 2001* - Suprema Specialties, Inc. (Nasdaq NMS: CHEZ) announces consolidated net sales and net income the fourth quarter and fiscal year ended June 30, 2001. Net sales for the fourth quarter ended June 30, 2001, increased 71% to approximately $130 million as compared to approximately $76 million for the same period in 2000.

Net sales for the fiscal year ended June 30, 2001, increased 51% to approximately $420 million as compared to approximately $278 million for the same period in 2000.

The increase in net sales for the fourth quarter reflects an increase primarily in sales volume for foodservice products manufactured and processed by the Company, and to a lesser extent, the higher average selling price for cheese (as a result of the higher CME Block Cheddar Market, the commodity index on which bulk cheese prices are based.)

Net income for the fourth quarter ended June 30, 2001, increased 42% to approximately $2.6 million as compared to $1.8 million for the same period in 2000. Net income for the year ended June 30, 2001, increased 39% to approximately $8.9 million as compared to net income of approximately $6.4 million for fiscal 2000.

The increase in net income is due primarily to an increase in operating income, which is a result of increased sales volume.

42.    A few days later, on August 15, 2001, the Company issued a more detailed release covering the same period, including commentary by Defendant Cocchiola, which read, in pertinent part:

**Suprema Specialties, Inc. Announces Record Fourth Quarter and Fiscal Year 2001 Financial Results**

*71 % increase in fourth quarter net sales - $130 million in 2001 compared to $76 million in 2000*

*51 % increase in year-end net sales - $420 million in 2001 compared to $278 million in 2000*

*Basic EPS increased to $1.63 in 2001 compared to $1.44 in 2000*
Paterson, NJ, August 15, 2001 - Suprema Specialties, Inc. (Nasdaq NMS: CHEZ) announces consolidated net sales, net income, and earnings per share for the fourth quarter and fiscal year ended June 30, 2001.

Net sales for the fourth quarter ended June 30, 2001, increased 71% to approximately $130 million as compared to approximately $76 million for the same period in 2000.

Net sales for the fiscal year ended June 30, 2001, increased 51 % to approximately $420 million as compared to approximately $278 million for the same period in 2000. The increase in net sales for the fourth quarter reflects an increase primarily in sales volume for foodservice products manufactured and processed by the Company, and to a lesser extent, the higher average selling price for cheese (as a result of the higher CME Block Cheddar Market, the commodity index on which bulk cheese prices are based.)

Net income for the fourth quarter ended June 30, 2001, increased 42% to approximately $2.6 million or $.46 per share (basic) and $.38 per share (diluted) as compared to $1.8 million or $.42 per share (basic) and $.35 per share (diluted) for the same period in 2000. Net income for the year ended June 30, 2001, increased 39% to approximately $8.9 million or $1.63 per share (basic) and $1.41 per share (diluted), as compared to net income of approximately $6.4 million or $1.44 per share (basic) and $1.23 per share (diluted) for fiscal 2000.

The increase in net income is due primarily to an increase in operating income, which is a result of increased sales volume. Earnings Per Share results of the fourth quarter and fiscal year end include an additional 1,180,000 shares of common stock issued in connection with our underwritten public offering completed during the first quarter of fiscal year 2001.

Mark Cocchiola, President and CEO, said, "Our performance is a real tribute to the strength of our management team and all of our dedicated employees. As a result, we're capturing a bigger share of the growing, all natural, Italian cheese foodservice business. We are producing larger orders and expanding our relationships with existing clients, as well as creating strong relationships with new customers."

Mr. Cocchiola continued, "This last quarter represents the 18th consecutive quarter of increased net sales, a record we are all extremely proud of. We firmly believe our strategic direction is sound and should create long-term value for our shareholders."

43.    On September 17, 2001, the Company filed a Registration Statement on Form S-2, which announced that the Company was selling 3,500,000 shares of common stock to the public and that certain Company insiders were selling 550,000 shares. The Form S-2, which was amended on October 12, 2001 and November 6, 2001, was signed by Defendants Cocchiola, Venechanos, Marco Cocchiola, Acosta, DeSocio, and Rutcofsky, and it expressly incorporated by reference the Company's annual report on Form 10-K, which was filed subsequent to the original Form S-2 on September 28, 2001.

44.    On September 28, 2001, the Company filed its Form 10-K for its fiscal year 2001, which contained the financial results that the Company had previously announced on August 8, 2001 and August 15, 2001. The Form 10-K was signed by Defendants Cocchiola, Venechanos, Marco Cocchiola, Acosta, DeSocio, and Rutcofsky and was expressly incorporated by reference into the Company's Registration Statement.

45.    On November 15, 2001, Suprema announced record financial results for the first quarter of its fiscal year 2002 in a press release that stated, in pertinent part:

**Suprema Specialties, Inc. Announces First Quarter 2002 Financial Results**

*60% Increase In Net Sales - $142.6 Million In 2001 Compared To $88.9 Million*

*In 2000*

*Basic EPS increased to $.62 In 2001 Compared To $.41 In 2000*

Paterson, NJ, November IS, 2001 - Suprema Specialties, Inc. (Nasdaq NMS: CHEZ) announces net sales, net income and earnings per share for the first quarter ended September 30, 2001.

Net sales for first quarter ended September 30, 2001, were approximately $142,650,000 compared to approximately $88,948,000 for the same period in 11 2000 - an increase of approximately $53,702,000 or 60%. For the first quarter ended September 30, 2001, the gross margin increased by 53% or approximately $7,490,000 to approximately $21,518,000 as compared to approximately $14,028,000 for the same period in 2000.

The increase in net sales reflects an increase in sales for food service products manufactured by the Company, as well as a higher average selling price for cheese (as a result of the higher CME Block Cheddar Market, the commodity index on which bulk cheese prices are based.)

Net earnings for the first quarter ended September 30, 2001, were approximately $3,565,000 or $.62 per share (basic), as compared to approximately $1,986,000 or $.41 per share (basic), for the same period in 2000 - an increase of approximately $1,579,000 or 79%. The increase in net earnings is due to the increase in gross margin resulting from increased sales for food service products, as well as an increase in other income, partially offset by the increases in selling and shipping, general and administrative expenses and interest expense.

Mark Cocchiola, President and CEO, said, "Although it was a difficult quarter personally with the death of our co-founder Paul Lauriero, our first quarter 2002 proved to be another outstanding growth quarter. Our quarter-by-quarter growth has continued as a result of our employees' ability to meet and exceed our customers' demands."

Mr. Cocchiola continued, "We were named to Fortune Magazine's list of 100 Fastest Growing Companies. The Company was ranked 23 overall. We have strategic goals and objectives in place for 2002 and we are dedicated to achieving them. We will strive to keep our commitment to meeting our customers' needs while working diligently to continuingly improve shareholder value."

46.   On November 14, 2001, the Company filed its Form 10-Q for the first quarter of its fiscal year 2002, which also contained the foregoing financial results. Defendants Cocchiola and Venechanos signed the Form 10-Q.

47.   The foregoing statements were materially false and misleading when made as they misrepresented and/or omitted the fact that Suprema's accounting practices resulted in significant and material overstatements of sales and earnings, which adverse fact existed at the time and disclosure of which was necessary to make the statements not false and/or misleading. Specifically, and without limitation, the foregoing statements failed to disclose that Suprema's "hard cheese" brokerage business, which accounted for the majority of the Company's sales (and nearly all of its explosive earnings growth) was largely a sham. Although the Company purported to (and represented to the public that it did) engage  in an arms-length "hard cheese" transactions, almost all of the Company's major trading partners in the "hard cheese" brokerage business were entities which were owned and/or controlled by the same individuals. These paper transactions, most of which lacked adequate documentation, were designed and intended to artificially inflate Suprema's revenues and profits, and to mislead shareholders and the general public as to the true financial condition of the Company.

## THE REVELATION

48.   A few weeks later, on December 21, 2001, Suprema issued a press release that read, in pertinent part:

**Suprema Specialties, Inc., Announces Internal Investigation**

PATERSON, N.J.--(BUSINESS WIRE)--Dec. 21, 2001--Suprema Specialties, Inc. (NASDAQ: CHEZ - news) announced today that following the resignations of its Chief Financial Officer and its controller, the Company has initiated an internal investigation of its prior reported financial results and has instructed its auditors to review the Company's financial records.

49.     In response to this revelation, the Nasdaq Stock Market, which lists Suprema stock, halted all trading in Suprema stock and, on December 24, 2001, announced that trading would remain halted until Suprema had fully satisfied Nasdaq's request for additional information from the Company.

50.     On January 8, 2002, the Suprema issued another press release announcing, in pertinent part:

### Suprema Specialties Provides Update On Internal Investigation

PATERSON, N.J.--(BUSINESS WIRE)--Jan. 8, 2002--Suprema Specialties, Inc. (Nasdaq: CHEZ - news) announced today an update regarding the internal investigation that the Company announced in its press release on December 21, 2001. The Company, with the assistance of its independent auditors, has continued to conduct an inquiry into the Company's financial records. Management's focus during this period has been on areas that it considers most material. The inquiry is not yet complete and, while it is not possible to predict the ultimate results of the inquiry, to date the Company has nothing to report. The Company and its Audit Committee are firmly committed to completing a thorough, expeditious inquiry of these matters.

51.     As of the filing of this complaint, Suprema common stock has been delisted from the NASDAQ exchange, and the Company is in Chapter 7 Bankruptcy. Both the FBI and the Chapter 7 Trustee in the Bankruptcy case are investigating Suprema's purported "hard cheese" brokerage business.

## VIOLATIONS OF GAAP AND SEC REGULATIONS

52.     The deceptive accounting practices described herein occurred in clear violation of GAAP and SEC Rules and Regulations.  GAAP are those principles recognized by the accounting professional as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time.

53.     SEC Regulation S-X (17 C.F.R. and §210.4(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements (17 C.F.R. §210.10-01(a)).

54.     Due to the accounting improprieties described above, the Defendants presented the Company's financial results and statements in a manner which violated GAAP. The following fundamental accounting principles were violated:

a.     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, 34);

b.     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, 40);

c.     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, 42);

d.      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, 50);

e.      The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement Concepts No. 2, 58-59);

f.      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, 79);

g.      The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, 95, 97);

h.      The principle that revenues and related earnings should not be recognized until earned and that expenses should be recognized in the period incurred. (FASB Statement of Concepts No. 5.)

## COUNT I
## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 OF THE SECURITIES AND EXCHANGE COMMISSION

55.      Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein. This Count is asserted against all defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b).

56.      During the relevant time period, defendants, singularly and in concert, directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business

which operated as a fraud and deceit upon the plaintiffs, and made various deceptive and untrue statements of material facts and omitted to state material in order to make the statements made, in light of the circumstances under which they were made, not misleading to the plaintiffs. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce the plaintiffs to purchase Suprema common stock at artificially inflated prices.

57.    During the relevant time period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, the preparation and issuance of deceptive and materially false and misleading statements to the investing public, as particularized above.

58.    During the relevant time period, the Individual Defendants, among other things, made false and misleading statements in press releases and in public filings, and caused Suprema to file false and misleading registration statements, financial statements, and other public documents.

59.    During the relevant time period, Suprema acted through the Individual Defendants, whom it portrayed and represented to the financial press and public as its valid representatives.

60.    During the relevant time period, as alleged herein, the Investment Bankers engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Suprema not misleading. There is a strong inference that the Investment Bankers acted knowingly or recklessly with respect to the fraudulent scheme alleged above, and that Investment Bankers had a motive and opportunity to do so. Specifically, the Investment Bankers were the underwriters for Suprema's secondary public offering. The Investment Bankers provided investment banking services to Suprema, and received investment banking fees from Suprema. In addition, on three consecutive days shortly after the secondary offering began, three analysts issued favorable research reports and placed "buy" ratings on Suprema stock. The three analysts worked for the

same three defendant Investment Bankers who had just finishing underwriting the secondary public offering. This tangled web of interrelationships demonstrates Investment Banker's participation in the fraudulent scheme to inflate the value of Suprema stock, in violation of the federal securities laws.

61.     During the relevant time period, BDO, individually and in concert with defendants, directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Suprema, including its true financial results, as specified herein. BDO employed devices, schemes, and artifices to defraud Plaintiffs while in possession of material, adverse non-public information, and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and omitting to state material facts necessary in order to make the statements made about Suprema not misleading.

62.     Specifically, BDO knew or should have known that (i) Suprema reported annual financial results for 2000 and 2001, as disseminated to shareholders in Suprema's 2001 annual report and in other public filings, which were materially overstated, and which were not prepared or presented in accordance with GAAP; and (ii) that BDO audits were not performed in accordance with GAAS; therefore, BDO's audit reports were materially false and misleading.

63.     The financial statements for the fiscal years ending June 30, 2000 and June 30, 2001 were materially false and misleading; contained untrue statements of material facts; omitted to state material facts necessary to make the statements made, under the circumstances in which they were made, not misleading; and failed to adequately disclose material facts. As detailed herein, the misrepresentations contained in, or the material facts omitted from, the financial statements included but were not limited to the overstatement of revenue for the fiscal years ending June 30, 2000 and June 30, 2001. The misrepresentations and omissions also included the representations issued by BDO in connection with its audits of Suprema's financial statements for those years, including that (i) BDO had audited Suprema's financial statements

"in conformity with accounting principles generally accepted in the United States"; and (ii) BDO's audits provided a "reasonable basis" for its opinions.

64.     As detailed herein, BDO's audit reports were materially false and misleading. BDO did not make a reasonable investigation or possess reasonable grounds for the belief that the statements described above, which were contained in the 2001 Independent Auditors Report, were true, were without omissions of any material facts, and were not misleading.

65.     BDO, with knowledge of the falsity and misleading nature of the statements contained in its audit report, and in reckless disregard of the true nature of its audits, caused the public statements complained of herein to contain misstatements and omissions of material facts. As described herein, BDO's audit of Suprema's financial statements for 2001 was not performed in accordance with GAAS, and, in fact, BDO had no basis for its opinions. BDO's Report dated August 7, 2001, issued in connection with that audit, as included in Suprema's 2001 Annual Report, in which BDO certified, *inter alia*, that its audits were performed in accordance with accounting principles generally accepted in the United States of America, was materially false and misleading.

66.     BDO acted with scienter in certifying the materially false and misleading financial statements, in that BDO either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted in reckless disregard of the truth in failing to ascertain and to disclose the true facts, even though such facts were available to BDO.

67.     BDO's misrepresentations and omissions were intentional or reckless. BDO, as Suprema's auditor, had unfettered access to Suprema's books and records throughout the audit period. BDO, as a renowned public accounting firm, certainly had knowledge of the requirements of GAAS. The following facts constitute actual evidence of and give rise to a strong inference that BDO acted with scienter:

a.     BDO knew or recklessly disregarded that it had not performed its audits of Suprema's 2001 financial statements in accordance with GAAS, and, therefore, that its

Independent Auditors' Report was materially false and misleading. Under GAAS, "[t]he auditor has a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud." AICPA Professional Standards, AU §110.02 (1998); AU §316.42 (1997). As described herein, BDO did not fulfill that responsibility. In fact, BDO's audits of Suprema's financial statements for 2000 and 2001 were so woefully inadequate that BDO repeatedly violated GAAS. BDO utterly failed to perform the most fundamental of procedures to provide a basis for its Report. As described below, BDO repeatedly and materially violated GAAS in conducting its audit, failed to plan or to perform its audits to obtain reasonable assurance that Suprema's financial statements were free of material misstatements, and, therefore, BDO had no basis upon which to state that Suprema's financial statements were presented in conformity with GAAP. For example:

      b.    BDO failed to obtain sufficient and competent evidence of the transactions related to Suprema's purported "hard cheese" brokerage business. "Most of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements." AU § 326.02. "The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly." AU § 326.21(c). Representations from management "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis for an opinion regarding the financial statements under audit." AU §333.02 (1998). "The books of original entry, the general and subsidiary ledgers, related accounting manuals, and records such as work sheets and spreadsheets supporting cost allocations, computations, and reconciliations all constitute evidence in support of the financial statements." "[W]ithout adequate attention to the proprietary and accuracy of the underlying accounting data, an opinion on financial statements would not be warranted." AU § 326.16(1998). BDO violated GAAS by failing to obtain sufficient competent evidence concerning Suprema's financial statements, and by failing to verify through documentation the oral representations given by management.

     c.    BDO failed to exercise professional skepticism. "Due professional care requires the auditor to exercise professional skepticism." This requires the auditor to "diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence." "In exercising professional skepticism the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest." AU §§ 230.07-09 (1998); AU § 316.43 (1997); AU § 316.16-21 (1997) (professional skepticism is required in planning and performing an audit). The auditor also "must be without bias with respect to the client since otherwise he would lack [the] impartiality necessary for the dependability of his findings." AU § 220.02. Notwithstanding these requirements, in connection with its planning and performing audit procedures concerning, *inter alia*, revenue recognition, earnings, and certain other matters described herein, BDO relied almost exclusively on representations from Suprema management rather than on sufficient competent evidential matter. BDO thus failed to exercise professional skepticism, and failed to exercise professional due care in the exercise of its audit.

     d.    BDO failed to properly consider fraud and irregularities. "The auditor should specifically assess the risk of material misstatement of the financial statements due to fraud and should consider that assessment in designing the audit procedures to be performed." AU §316.12(1998); AU §316A.05(1997) ("The auditor should assess the risk that errors and irregularities may cause the financial statements to contain a material misstatement."). One of the factors in assessing the risk of fraudulent financial reporting is whether there is a known history of securities law violations or claims against the entity or its senior management alleging fraud or violations of securities laws. AU §316.17(1998). To limit the risk of financial statement misstatement as a result of fraud, the auditor should perform procedures, including a detailed review of the client's quarter-end and year-end adjusting journal entries and an investigation of any entries that appear unusual as to nature or amount and of significant and unusual transactions, particularly those occurring at or near quarter-or year-end. AU §316.29(1998). BDO violated GAAS because it failed to properly consider the risk that Suprema's financial statements would be materially misstated as a result of fraud or irregularities. BDO did not

sufficiently consider past allegations and an SEC investigation against Suprema regarding the Company's revenue recognition policies. BDO did not perform a review or investigation of any quarter or year-end journal entries, nor did BDO investigate significant and unusual transactions.

        e.     BDO failed to properly identify and consider related party transactions. An auditor should perform procedures "to identify related party relationships and transactions and to satisfy himself concerning the required financial statement accounting and disclosure." AU §334.01. "The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. Certain relationships, such as parent-subsidiary or investor-investee, may be clearly evident." AU §334.07. To identify material transactions with related parties, the auditor should, among other things, "[r]eview accounting records for large, unusual, or nonrecurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period." AU §334.08(g). Once material related party transactions are identified, the auditor should perform procedures necessary to evaluate "the purpose, nature and extent of these transactions and their effect on the financial statements. The procedures should be directed toward obtaining and evaluating sufficient competent evidential matter and should extend beyond inquiry of management." AU §334.09. Those procedures should include, among other things, to:

> [a]rrange for the audits of intercompany account balances to be performed as of concurrent dates, even if the fiscal years differ, and for the examination of specified, important, and representative related party transactions by the auditors for each of the parties, with appropriate exchange of relevant information.

AU § 334.09(e). BDO violated GAAS, because it failed to obtain sufficient competent evidential matter concerning, and, therefore, failed to properly evaluate, the intercompany transactions recorded by Suprema and by and among various subsidiaries to, *inter alia*, improperly account for research and development expenses as revenues. Moreover, BDO failed to investigate and/or reveal that the entities with whom the Company purportedly entered into

"hard cheese" trading transactions were in fact themselves related entities, which would have revealed the non-arms length nature of those transactions.

68.    BDO's audit reports for the 2000 and 2001 fiscal years did not contain any adverse opinion or a disclaimer of opinion and were not qualified or modified as to the uncertainty, audit scope or accounting principles.

69.    On February 18, 2002, only a month after the FBI started its probe into Suprema and just a few days before Suprema filed for bankruptcy, BDO resigned as Suprema's independent auditors.

70.    As a result of the dissemination of the false and misleading statements set forth above, the market price of Suprema common stock was artificially inflated during the period in which Plaintiffs purchased Suprema shares. In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendants, Plaintiffs relied, to their detriment, on the Registration Statements and other information filed with the SEC and made available to the public by defendants in purchasing Suprema common stock. Had Plaintiffs known the truth, they would not have purchased the shares or would not have purchased them at the inflated prices that were paid.

71.    Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of their occurrence.

72.    Plaintiffs have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

73.    By reason of the foregoing, defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their purchases of Suprema common stock.

## COUNT II
## VIOLATION OF SECTION 20(a)
## OF THE EXCHANGE ACT

74.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein. This Count is asserted against the Individual Defendants and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

75.    The Individual Defendants, by virtue of their positions, stock ownership and/or specific acts described above, were, at the time of the wrongs alleged herein, controlling persons within the meaning of Section 20(a) of the Exchange Act.

76.    The Individual Defendants had the power and influence to and did in fact exercise that power and influence to cause Suprema to engage in the illegal conduct and practices complained of herein.

77.    By reason of the conduct alleged in Count I of the Complaint, the Individual Defendants are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages which they suffered in connection with their purchases of Suprema common stock.

## COUNT III
## VIOLATION OF SECTION 11
## OF THE SECURITIES ACT

78.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if set forth fully herein. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Individual Defendants and BDO.

79.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under the Securities Act.

80.   In the course of making their purchases of Suprema stock in connection with the August 2000 and September 2001 public stock offerings, Plaintiffs reviewed and relied upon all of Suprema's SEC filings, registration statements, and prospectuses, in an effort to consider all publicly-available material information about Suprema and the securities concerned.

81.   The defendants named above caused to be effected a distribution of shares of Suprema's common stock to the public pursuant to registration statements that were in effect during the relevant time period.   The Registration Statements were materially misleading; contained untrue statements of material facts; omitted to state material facts required to be stated therein or necessary to make the statements made, under the circumstances in which they were made, not misleading; and failed adequately to disclose material facts as set forth above.

82.   Suprema is the registrant for the offering and filed the Registration Statements as the issuer of the Suprema shares issued in the offerings, as defined in Section 11(a)(5) of the Securities Act.   Suprema, the Individual Defendants, and BDO were responsible for the contents of the Registration Statements and caused their filings with the SEC.

83.   Suprema, Cocchiola, and Venechanos were issuers of the stock sold by means of the May 2000, August 2000, and September 2001 offerings.   As issuers of the shares, they are liable to Plaintiffs for the misstatements in, and omissions from, the Registration Statements.

84.   Suprema and the Individual Defendants signed the Registration Statements and/or otherwise caused them to be prepared, filed with the SEC and circulated to the public.   Defendant BDO certified the financial information contained in the Registration Statements, and, accordingly, is liable for the false and misleading information contained therein.

85.   At the time they acquired Suprema's common stock, Plaintiffs did not know, nor or by the exercise of reasonable care could they have known, of the facts concerning the inaccurate and misleading statements and omissions alleged herein.

86.   The shares of Suprema common stock purchased by Plaintiffs were purchased in the offerings, or are traceable to shares purchased in the offerings.

87.    In connection with the offerings and issuance of Suprema common stock, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the facilities of a national market and/or the U.S. mails.

88.    This action was brought within one year after the discovery of the untrue statements and omissions and within three years after Suprema common stock was issued to the public in the offerings.

89.    By reason of the foregoing, defendants have violated Section 11 of the Securities Act and are liable to the plaintiffs who were damaged by reason of such violations, in a total amount to be determined at trial.

### COUNT IV
### VIOLATION OF SECTION 12(a)(2)
### OF THE SECURITIES ACT

90.    Plaintiff repeats and realleges the allegations contained in the preceding paragraphs. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, against the Individual Defendants and the Underwriter Defendants.

91.    The Individual Defendants and the Underwriter Defendants offered and issued securities, namely shares of Suprema common stock, by means of more than one prospectus (the "Prospectus"). These Prospectuses contained untrue statements of material facts and omitted to state material facts required to be stated therein or necessary to make the statements made in the Prospectus not misleading, as set forth above.

92.    The offering materials included untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as set forth with greater particularity herein. Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements and Prospectus.

93.    Plaintiffs did not know of any of the untruthful statements and omissions alleged and in the exercise of reasonable care could not have known of them.

94.    This action is commenced within three years of the public offerings and within one year of the time plaintiffs, purchasers the stock, discovered or could have discovered the existence of untrue statements by exercising due diligence.

95.    Plaintiffs hereby tender their common stock to the defendants and seek rescission of their purchases to the extent that they continue to own such securities.

**COUNT V**
**VIOLATION OF SECTION 15**
**OF THE SECURITIES ACT**

96.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Individual Defendants.

97.    Throughout the relevant time period, each of the Individual Defendants, by reason of his or her executive position or positions and as the owner, directly and/or indirectly, of their shares of Suprema common stock, had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  As a result, at the time of the wrongs alleged herein, the Individual Defendants were "controlling persons" of the Company within the meaning of Section 15 of the Securities Act.

98.    Each of the Individual Defendants named herein issued, caused to be issued, and participated in the issuance of the materially false and misleading statements contained in, or the material facts omitted from, the Registration Statements and signed the same.  Pursuant to Section 15(a) of the Securities Act, by reason of the foregoing, each of the Individual Defendants is liable to the same extent as is Suprema for the Company's aforesaid violations of Section 11 and 12(a)(2) of the Securities Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs have suffered substantial damages in connection with their acquisition of Suprema common stock.

**COUNT VI**

-29-

## Against All Defendants for Violations of Section 18 of the Exchange Act

99.     Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs.  This Count is asserted against the all Defendants for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r, on behalf of Plaintiffs who were damaged thereby.

100.    For purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this claim is based on solely on claims of strict liability and/or negligence under Section 18 of the Securities Exchange Act.

101.    Plaintiffs have brought this claim within one year of discovery of the violations alleged herein, and within three years of the accrual of this cause of action.

102.    As alleged herein, the Defendants made or caused to be made statements in documents filed with the SEC pursuant to the rules or regulations of the Exchange Act or undertakings contained in registration statements as provided in subsection (d) of section 15 of the Exchange Act, which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

103.    In ignorance of the falsity of the Defendants' statements or of the true facts, Plaintiffs purchased Suprema securities in reliance upon the Defendants' representations.

104.    The Defendants' materially false or misleading statements artificially inflated the price of Suprema securities.

105.    Had they known the true facts, Plaintiffs would not have purchased the Suprema securities and/or would not have purchased them at the inflated price.

106.   Upon disclosure of the true facts, the price of the Suprema securities purchased by Plaintiffs dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

107.   By reason of the foregoing, the Defendants are liable for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

## COUNT VII
### Against All Defendants for Common Law Fraud/ Fraudulent Misrepresentation

108.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs. This Count is brought against all defendants for common law fraud and fraudulent misrepresentation.

109.   As described more fully above, defendants made numerous misrepresentations of material fact which were designed and intended to induce Plaintiffs to purchase shares of Suprema common stock.

110.   Defendants acted with knowledge of the falsity of the representations that they made, or with reckless disregard of the truth or falsity of those representations, for the purpose of fraudulently inducing Plaintiffs to purchase shares of Suprema common stock.

111.   Plaintiffs justifiably relied upon Defendants' misrepresentations, which directly and proximately caused Plaintiffs to suffer substantial damages.

112.   By reason of the foregoing, Defendants have committed common law fraud and fraudulent misrepresentation.

## COUNT VIII
### Against All Defendants for Negligent Misrepresentation

113.   Plaintiff repeats and realleges the allegations contained in the preceding paragraphs. This Count is brought against all defendants for negligent misrepresentation.

114. As described more fully above, defendants made numerous misrepresentations of material fact which induced Plaintiffs to purchase shares of Suprema common stock.

115. Defendants were negligent in failing to investigate the truth or falsity of those representations.

116. Plaintiffs justifiably relied upon Defendants' misrepresentations, which directly and proximately caused Plaintiffs to suffer substantial damages.

117. By reason of the foregoing, Defendants have committed negligent misrepresentation.

**WHEREFORE**, plaintiff prays for judgment as follows:

A. Awarding compensatory damages in favor of the plaintiffs against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

B. Awarding plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs attorneys, and experts;

C. Granting extraordinary equitable and/or injunctive relief as permitted by law; and

D. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial of all issues so triable.

Respectfully submitted,
LOWENSTEIN SANDLER PC
Attorneys for Plaintiffs

By: _____
Lawrence M. Rolnick (LR-0546)

DATED: June 26, 2002

OF COUNSEL:
Marc B. Kramer, Esq.
150 JFK Parkway, Suite 100
Short Hills, New Jersey  07078

S5313/26
1228844.01