**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| : | |
| : | |
| SPECIAL SITUATIONS FUND, III, L.P., et : | **OPINION** |
| al., : | |
| Plaintiffs, : | Civ. No. 02-3099 (WHW) |
| v. : | |
| : | |
| MARK COCCHIOLA, et al., : | |
| Defendants. : | |

**Walls, Senior District Judge**

The plaintiffs, Special Situations Fund, III, L.P. and Special Situations Cayman Fund, L.P., move for partial summary judgment under Fed. R. Civ. P. 56. Pursuant to Fed. R. Civ. P. 78, the motion is decided without oral arguments. The motion is granted in part and denied in part.

## FACTS AND PROCEDURAL HISTORY

This motion concerns the non-class action portion of a consolidated securities litigation, In re: Suprema Specialties Inc. Securities Litigation, which consists of Special Situations Fund, III, L.P. v. Cocchiola, No. 02-3099 (WHW), the non-class action, and Smith v. Suprema Specialties, Inc., No. 02-0168 (WHW), a class action brought by separate plaintiffs. The facts and procedural history of the consolidated action have been largely set forth in the Court's opinions of June 25, 2003 and August 26, 2004, and in the Court of Appeals' mandate of

-1-

**NOT FOR PUBLICATION**

February 23, 2006, and so only a brief version of relevant facts is recounted here.  In re: Special

Situations Inc. Sec. Litig., Nos. 02-3099, 02-0168 (D.N.J. June 25, 2003); In re: Special

Situations Inc. Sec. Litig., 334 F. Supp. 2d 637 (2004); In re: Special Situations Inc. Sec. Litig.,

438 F.3d 256 (3d Cir. 2006).

The plaintiffs in this action are two institutional investors, Special Situations Fund, III,

L.P. and Special Situations Cayman Fund, L.P. (collectively the "Special Situations plaintiffs" or

the "plaintiffs").  The Special Situations plaintiffs purchased 250,000 newly-issued Suprema

Specialties, Inc. ("Suprema") common stock shares, worth $ 2 million, from the lead stock

underwriter, Hobbs Melville Securities Corp. ("Hobbs Melville"), in an August 2000 secondary

stock offering (the "2000 Offering").[1]  Special Situations alleges that its purchase of these shares

resulted from false and misleading statements in Suprema's public filings.

Suprema was a New York corporation that manufactured, processed, imported, and

marketed cheese products.  Headquartered in Paterson, New Jersey, Suprema had processing

plants in New Jersey, California, New York, and Idaho.  Suprema was founded in 1983 as a non-

public corporation, and went public in 1991.  It was listed on the NASDAQ exchange in 1993.

After showing impressive growth in the late 1990s, Suprema made a secondary stock offering of

1.2 million shares of common stock in 2000.  In November 2001, Suprema effected another

secondary offering (the "2001 Offering") of 3,500,000 shares of common stock, which were sold

for $41.5 million.  The company filed for bankruptcy protection in February 2002.

_____

[1]The Special Situations plaintiffs also purchased Suprema shares on other occasions, including a 2001 offering of common stock.  The offering in 2001 is not at issue here, because it was underwritten by a different set of underwriters.

**NOT FOR PUBLICATION**

The plaintiffs allege that the spectacular growth in sales and receivables Suprema reported from 1999 to 2001 was the result a fraudulent scheme to inflate revenues. In this scheme, Suprema sold cheese products to fictitious buyers, who resold the cheese to fictitious suppliers. In turn, these suppliers resold the cheese to Suprema. For the most part, no actual cheese changed hands; when it did, the cheese products were of a much lower grade than Suprema represented. The volume of fraudulent sales transactions led creditors to increase Suprema's line of credit,[2] which allowed Suprema to further enlarge the circular sale scheme. In August 2000, Suprema sold $8.6 million of Suprema shares and certain shareholders sold $1.5 of their Suprema shares to the public through certain underwriters in the 2000 Offering. From late 1998 to late 2000, as the company's reported sales and revenues grew, Suprema's share price doubled. In September 2001, shortly before the 2001 Offering, Fortune Magazine named Suprema the twenty-third fastest growing small company in America.

On December 21, 2001, Suprema announced an internal investigation of its reported financial results. Shortly thereafter, the NASDAQ exchange suspended the trading of Suprema shares. On January 25, 2002 Suprema announced that it had retained the outside accounting firm Deloitte & Touche, LLP to assist in its investigation. On February 24, 2002 Suprema filed for Chapter 11 bankruptcy protection. On March 20, 2002 the bankruptcy proceeding was converted to a Chapter 7 liquidation.

In 2002, the Special Situations plaintiffs filed their initial complaint in federal court. In

---

[2]As example, from June 1999 to September 2001, Suprema increased its line of credit from $30.4 to $113.7 million.

**NOT FOR PUBLICATION**

August 2006, after the case had been remanded to this Court from the Third Circuit, the Special

Situations plaintiffs filed their third amended complaint ("TAC").  In that complaint, the Special

Situations plaintiffs articulate claims under sections 11, 12(a)(2), and 15 of the Securities Act of

1933, under sections 10(b), 18, and 20 of the Securities Exchange Act of 1934, and under

theories of common law fraud and negligent misrepresentation.  These claims are directed against

various defendants, including certain Suprema officers and directors, an outside auditor, and

underwriters of the 2000 and 2001 secondary stock offerings.

This motion for summary judgment concerns only certain defendants who were members

of what the Special Situations plaintiffs characterize as an "underwriting syndicate" that

underwrote the 2000 Offering.  The Special Situations plaintiffs claim that documents relating to

the 2000 Offering, including the prospectus and registration statement, contained

misrepresentations and omissions of material facts, and assert claims against the underwriters of

that offering under section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §

77k, (TAC ¶¶ 185-88), and under a common law theory of negligent misrepresentation.  (TAC ¶

520.)

The Special Situations plaintiffs allege that the syndicate that underwrote the 2000

offering was led by Hobbs Melville and included seven other underwriters: Auerbach, Pollak &

Richardson, Inc. ("Auerbach"); Girard Securities, Inc. ("Girard"); Mercer Partners, Inc.

("Mercer"); Oberweis.net ("Oberweis"); Paulson Investment Company Inc. ("Paulson"),

Westminster Securities Corporation ("Westminster"); Westport Resources Investment Services,

Inc. ("Westport").  According to the Special Situations plaintiffs, three members of the syndicate

NOT FOR PUBLICATION

-- Hobbs Melville, Auerbach, and Mercer -- ceased operating before this lawsuit was filed.

The Special Situation plaintiffs bring these motions for partial summary judgment against the five remaining members of the underwriting syndicate: Girard, Oberweis, Paulson, Westminster, and Westport.  The plaintiffs seek summary judgment on two separate issues. First, they ask the Court to rule that each of these five companies was an "underwriter" as defined under the Securities Act.[3]  Second, they ask the Court to rule that Section 11(e) of the Securities Act limits the principal liability of each of the members of the alleged underwriting syndicate to the value of the shares each underwrote, rather than the number that they personally sold.  Both of these motions are significant to the Special Situations plaintiffs' litigation because these five members of the underwriting syndicate played less significant roles than Hobbs Melville and Auerbach, the now-defunct leaders of the syndicate.

## LEGAL STANDARD

### I.  Summary Judgment

Summary judgment is appropriate where the moving party establishes that "there is no

---

[3]Section 11 of the Securities Act creates a cause of action against numerous persons, including underwriters, for misrepresentations in registration statements:

> In case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact . . . any person acquiring such security . . . may . . . sue . . . every underwriter with respect to such security.

15 U.S.C. § 77k(a).  To have a cause of action against any of the alleged members of the underwriting syndicate under this provision of section 11, a plaintiff must first prove that person is an "underwriter."  See In re Global Crossing, Ltd. Securities Litig., 313 F. Supp. 2d 189, 212 (S.D.N.Y. 2003).

**NOT FOR PUBLICATION**

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary

judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for

the non-movant and it is material if, under the substantive law, it would affect the outcome of the

suit. See id. at 248. The initial "burden of showing the absence of a genuine issue as to any

material fact" rests on the moving party. Adickes v. S. H. Kress & Co., 398 U.S. 144, at 157

(1970). See also Celotex v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts in question."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a

motion for summary judgment, a nonmovant must present more than a mere scintilla of evidence

in his favor. Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The opposing

party must set forth specific facts showing a genuine issue for trial and may not rest upon the

mere allegations or denials of its pleadings. Shields v. Zuccarini, 254 F.3d 476, 481 (3d Cir.

2001).

At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. See Anderson, 477 U.S. at 249. In doing so, the court must construe the facts and

inferences in the light most favorable to the non-moving party. Curley v. Klem, 298 F.3d 271,

277 (3d Cir. 2002).

NOT FOR PUBLICATION

## DISCUSSION

### I.  Are the defendants underwriters as defined by the Securities Act?

The Special Situations plaintiffs ask the Court to grant summary judgment that Paulson, Oberweis, Westminster, Westport, and Girard are underwriters under the Securities Act.  The plaintiffs claim that Paulson and Overweis are underwriters because they purchased stock shares from Suprema and distributed those shares to the public.  In contrast, the plaintiffs do not contend that Westminster, Westport, and Girard actually sold shares to the public.  Nevertheless, they maintain that these three defendants are underwriters because they participated in the offering and in the direct or indirect underwriting of the offering.

#### A. Section 2(11) of the Securities Act

"An underwriter is commonly understood to be a 'person who buys securities directly or indirectly from the issuer and resells them to the public, or performs some act (or acts) that facilitates the issuer's distribution.'"  In re WorldCom, Inc. Securities Litigation, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) (citations omitted).  Section 2(11) of the  Securities Act expressly defines the term "underwriter" for the purposes of that Act as:

> . . . any person who <u>has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security</u>, or <u>participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking</u>; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

NOT FOR PUBLICATION

15 U.S.C. 77b(a)(11) (emphasis added).

From this section, it is apparent Congress defined broadly the term "underwriter" in the

Securities Act.  The term most clearly includes persons who purchased a security from an issuer

with a view to its distribution and persons who offered or sold the security for an issuer in

connection with its distribution.   It also includes persons who "'participate in,' [] have 'direct or

indirect participation in,' or [] have a 'participation in the direct or indirect underwriting of,' (1)

the purchase of the [security] with a view to distribution, or (2) the offer or sale of the [security]

in connection with [its] distribution."  <u>Harden v. Raffensperger, Hughes & Co., Inc.,</u>  65 F.3d

1392, 1400 (7th Cir. 1995).  In short, an underwriter is one who "participates in the transmission

process between the issuer and the public."  <u>Ingenito v. Bermec Corp.,</u> 441 F. Supp. 525, 536

(S.D.N.Y. 1977).

A 1933 House of Representatives committee report better explains the categories of

underwriters encompassed by the statute's definition of the term:

> The term is defined broadly enough to include not only the ordinary underwriter, who for
> a commission promises to see that an issue is disposed of at a certain price, but also
> includes as an underwriter the person who purchases an issue outright with the idea of
> then selling that issue to the public.  The definition of underwriter is also broad enough to
> include two other groups of persons who perform functions, similar in character, in the
> distribution of a large issue.  The first of these groups may be designated as the
> underwriters of the underwriter, a group who, for a commission, agree to take over pro
> rata the underwriting risk assumed by the first underwriter.  The second group may be
> termed participants in the underwriting or outright purchase, who may or may not be
> formal parties to the underwriting contract, but who are given a certain share or interest
> therein.

H.R. Rep. 73-85, at 13 (1933).  A later House conference report explains how the Senate

amendment to the House bill limited the scope of the term to those who actually "participate" in

NOT FOR PUBLICATION

the offering. Contrary to the implication of the House report, the term "underwriter" does not

encompass those who merely have an "interest" in the offering.

> The [Senate's] substitute amends the definition of underwriter contained in the House bill
> so as to make clear that a person merely furnishing an underwriter money to enable him
> to enter into an underwriting agreement is not an underwriter. Persons, however, who
> participate in any underwriting transaction or who have a direct or indirect participation
> in such a transaction are deemed to be underwriters. The test is one of participation in the
> underwriting undertaking rather than that of a mere interest in it.

H.R. Conf. Rep. 73-152, at 24 (1933).

Judicial interpretation of the statutory definition, though hardly comprehensive, further

clarifies the statutory definition of "underwriter." To be an underwriter under the Securities Act,

it is not necessary for a person to undertake the risk that they will be left holding unsold shares.

In other words, the term "underwriter" in the Securities Act includes persons who take part in

both "firm commitment" and "best efforts" offerings. Dale v. Rosenfeld, 229 F.2d 855, 857 (2nd

Cir. 1956).[4] Nor must a party actually sell shares to the public to be an underwriter under the

Securities Act, mere participation in an offering is enough. Harden v. Raffensperger, Hughes &

Co., Inc., 65 F.3d 1392, 1400-01 (7th Cir. 1995); SEC v. Intern'l Chem. Dev. Corp., 469 F.2d

20, 32 (10th Cir. 1972). Finally, courts have held that a person need not derive any financial

benefit from his participation in the distribution of security to be considered an underwriter.

Intern'l Chem. Dev. Corp., 469 F.2d at 33.

_____

[4]"In a 'best efforts' underwriting, the underwriter undertakes to sell the offering to the
public but assumes no responsibility for any shares not sold. Such an arrangement may be
contrasted to a 'firm commitment' underwriting, in which the underwriter assumes the risk of
loss on the unsold portion of the distribution." SEC v. Coven, 581 F.2d 1020, 1022 n.3 (2d Cir.
1978) (citation omitted).

NOT FOR PUBLICATION

Courts have also interpreted what "participation" means in the context of the statutory

definition of underwriter.  The Seventh Circuit has interpreted the phrases "participate in" and

"participation" in section 2(11) to mean "engage in steps necessary to the distribution of

securities":

> [I]n <u>SEC v. Van Horn</u>, 371 F.2d 181 (7th Cir. 1966), we commented . . . that "the
> statutory definition [of underwriter, contained in section 2(11)] specifically covers every
> person who participates in a distribution of securities." 371 F.2d at 188 . . . .  We
> subsequently noted that <u>Van Horn</u> "suggests that the term 'underwriter' is broad enough
> to encompass all persons who engage in steps necessary to the distribution of securities."
> <u>SEC v. Holschuh</u>, 694 F.2d 130, 139 n.13 (7th Cir. 1982) (considering section 5 liability,
> but declining to rule on scope of section 2(11)). Other courts have interpreted section
> 2(11) in similar fashion.  Under this view of the statutory definition, it is clear that
> Raffensperger would qualify as an underwriter in this case.  Its role as qualified
> independent underwriter was "necessary to the distribution of [the Firstmark] securities."
> <u>Cf.</u> <u>Holschuh</u>, 694 F.2d at 139 n.13.

<u>Harden</u>,  65 F.3d at 1400-01 (parantheticals in original).[5]  <u>See also</u> <u>Intern'l Chem. Dev. Corp.</u>,

469 F.2d at 33 (person whose "participation was a vital aspect in the steps necessary to the

distribution" is underwriter under section 2(11)); <u>see also</u> <u>SEC v. N. Am. Research and Dev.</u>

<u>Corp.</u>, 280 F. Supp. 106, 126 (S.D.N.Y. 1968), <u>aff'd in part and vacated in part on other grounds</u>,

424 F.2d 63 (2d Cir. 1970) (person who listed security in "Pink Sheets," a function essential to

---

[5]In <u>Harden</u>, the Seventh Circuit affirmed the district court's holding that "qualified
independent underwriter" listed in a prospectus was an underwriter under the Securities Act.
Since National Association of Securities Dealers ("NASD") rules required the participation of a
"qualified independent underwriter" in the issue, the Seventh Circuit reasoned that the qualified
independent underwriter was necessary to the issue, and so an underwriter under the Securities
Act definition as well.  NASD rules require that the interest of public debt issues be set at a rate
not less than that recommended by a qualified independent underwriter.  The qualified
independent underwriter must also assist in the preparation of the registration statement and
prospectus.  The NASD rules set forth numerous requirements that a person must meet to act as a
"qualified independent underwriter."  <u>Harden</u>, 65 F.3d at 1997-98.

NOT FOR PUBLICATION

distribution and ordinarily performed by underwriter, is underwriter precluded from exemption under section 4(1) of the Securities Act).

Courts have held that certain actions do constitute participation under section 2(11). For instance, a person who takes part in the actual preparation of the registration statement or prospectus is an underwriter. See In re Activision Sec. Litig., 621 F. Supp. 415, 424 (N.D. Cal. 1985). A person who, motivated by increasing the value of shares he is holding, solicits brokers in various parts of the country and distributes sales literature, is considered an underwriter. N. Am. Research, 280 F. Supp. at 127. The General Counsel of the SEC, in a 1938 opinion letter, implied that a "person enjoying substantial relationships with the issuer or underwriter, or engaging in the performance of any substantial functions in the organization or management of the distribution" would be considered an underwriter by virtue of participating in the issue.[6] Opinion of General Counsel relating to Rule 142, Sec. Act Release No. 1862, 1938 WL 31127 (Dec. 14, 1938).

Courts have also found that certain actions do not necessarily constitute participation under section 2(11). Marginal participation, such as limited solicitation of purchases or distribution of sales literature without compensation, N. Am. Research, 280 F. Supp. at 128, or simply writing sales literature, see id., does not necessarily make someone an underwriter. See also McFarland v. Memorex Corp., 493 F. Supp. 631, 645-46 (N.D. Cal. 1980) (warrantholders who (1) had no indirect or direct interest in underwriting, (2) did not bear risk in sale of shares to

_____

[6]More precisely, the General Counsel opined that such a person could not avail himself of the SEC Rule 142 "safe harbor" provision, which is limited to persons who agree to purchase solely for investment shares that were issued, but remained unsold. 17 C.F.R. § 230.142 (1938).

NOT FOR PUBLICATION

public, and (3) did not hold themselves out as experts able to evaluate financial condition of

issuing company did not "participate" in the issue, and so were not underwriters).

In itself, that a person is listed as an underwriter in a prospectus or registration statement

does not require, as a matter of law, a court to find that the person is an underwriter.  See In re:

Sec. Am. Corp. Sec. Litig, No. 81 C 3910, 1985 WL 2266, at *4 (N.D. Ill. Aug. 9, 1985)

(defendant who accepted offer to participate in stock offering and then withdrew, but name

remained listed in prospectus, granted summary judgment because not underwriter); see also Re

Comstock-Dexter Mines, Inc., SEC Release No. 33-2691, 1941 SEC LEXIS 229 (October 23,

1941) (defendant contracted by issuer to supervise stock sales not necessarily underwriter where

plaintiff had not demonstrated that defendant had supervised or solicited sales).  However, a

factfinder could find that persons who were identified in the prospectus as an underwriter and

arranged to have their stock included in a registration statement are underwriters.  Byrne v.

Faulkner, Dawkins, & Sullivan, 550 F.3d 1303, 1312 (2d Cir. 1977).[7]

### B. Analysis

The Special Situations plaintiffs have introduced numerous pieces of evidence to support

their contention that all five members of the alleged underwriting syndicate – Girard,

Westminster, Westport, Paulson, and Oberweis – acted as underwriters of the 2000 Offering.

Suprema's August 24, 2000 prospectus (the "Prospectus") lists Girard, Westminster, Westport,

---

[7]Unlike here, the defendant-underwriters in Byrne had the burden to prove that the Security Act's section 4 exemption for brokers applied.  The Second Circuit found that the defendants had not proven that they were brokers, who are exempt from certain requirements, and not underwriters, who are not exempt.  550 F.3d at 1312.

NOT FOR PUBLICATION

Paulson, Oberweis, and Mercer[8] as underwriters who each agreed to purchase 75,000 Suprema

shares, subject to "approval of certain legal matters by counsel and to certain other conditions."

(Oliver Cert., Ex. A at 27).  A document, filed with the SEC on or about July 24, 2000, titled the

"Underwriting Agreement," states that Suprema "proposes to issue and sell to the several

Underwriters named in Schedule I hereto" 1 million shares of its stock.  (Oliver Cert., Ex. H, at

1.)  However, Schedule I of the Underwriting Agreement lists only one underwriter, Hobbs

Melville Securities Corp., id. at 29, which is described in the agreement as the "representative" of

the "several underwriters."  Id. at 1.

### 1. Girard

The Special Situations plaintiffs argue that Girard was an underwriter under section 2(11)

because Girard participated in the offering and in the direct or indirect underwriting of the

offering.  However, aside from the Prospectus and Underwriting Agreement, they produce no

evidence to gauge Girard's involvement in the 2000 Offering.  Plaintiffs' counsel asserts that he

served their first request for document on Girard's counsel in August 2006, and, as of February 2,

2007, Girard has produced no documents in response.  (Oliver Cert., at 5.)  In response to the

plaintiffs' motion for summary judgment, Girard argues that the evidence introduced by the

plaintiffs is insufficient to show that no material issue of fact exists with respect to its

participation in the offering.

---

[8]The Prospectus also states Hobbs Melville and Auerbach, the now-defunct principal
underwriters of the 2000 Offering, agreed to purchase a total of 750,000 shares from Suprema
and certain selling shareholders.  Hobbs Melville and Auerbach are described as
"representatives" for the other five underwriters.  (Oliver Cert., Ex. A at 27.)

NOT FOR PUBLICATION

The Court concludes that the Special Situations plaintiffs have not met their burden of proof.  The Prospectus and Underwriting Agreement are ambiguous, and do not clearly demonstrate the extent of Girard's actual participation in the 2000 Offering.  On this evidence, a reasonable jury could well determine that the plaintiffs have not proved that Girard participated in the offering or in the underwriting of the offering.  There exists a genuine, material issue of fact.  Summary judgment against Girard is denied on this issue.

## 2. Westminster and Westport

Similarly, the Special Situations plaintiffs argue that Westminster and Westport are underwriters because they participated in the offering or in the underwriting of the offering.  With respect to Westminster, the plaintiffs also rely on several additional pieces of evidence which they argue support summary judgment in their favor.  They submit: (1) a copy of a document entitled "Agreement Among Underwriters," signed by John D. Fine, described as a Westport V.P, on August 16, 2000, which states that Westport confirms its agreement to purchase Suprema shares as provided by the "Underwriting Agreement" (Oliver Cert., Ex. G); (2) two facsimiles, dated August 24 and August 25, 2000, sent from Hobbes Melville to Westport, which state that Westport's final underwriting participation is 75,000 shares and its final retention amount is 0 shares[9] (Oliver Cert., Exs. O, P); (3) a November 20, 2000 letter from Hobbs Melville to Westport stating that a check for $2,350.00 enclosed with the letter represents Westport's underwriting fee for its participation in the Suprema offering (Oliver Cert., Ex. Y);

_____

[9]A "final retention amount" of zero indicates that Hobbs Melville allocated Westport no shares to sell to the public.  See In re: Sec. Am. Corp., 1985 WL 2266, at *4.

-14-

**NOT FOR PUBLICATION**

and (4) a copy of a November 20, 2000 check for $2,350.00, signed by James Carrazza, drawn on Hobbs Melville's Citibank account and payable to Westport.  Id.

Westport points out that it was not identified as an underwriter anywhere in the original registration statement for the 2000 Offering filed with the SEC on May 10, 2000, or in either of the two amended registration statements filed on May 24 and July 24, 2000.  (Nooshin Cert., Exs. 11, 12, 13.)

As to Westminster, the plaintiffs introduce evidence substantially similar to that introduced with respect to Westport.  This evidence includes: (1) an undated copy of the "Agreement Among Underwriters" discussed above, signed by James M. Carazza, identified as the CEO of Hobbs Melville, and by John P. O'Shea, identified as the president of Westminster (Oliver Cert., Ex. F); (2) an August 25, 2000 Westminster facsimile transmittal sheet from John O' Shea to James Carrazza of Melville which states that the signed Agreement among Underwriters is attached and thanking Carrazza for "the opportunity to participate in this placement" (Oliver Cert., Ex. L); (3) August 24 and August 25, 2000 facsimiles from Hobbes Melville to Westminster stating that Paulson's final underwriting participation is 75,000 shares and its final retention amount is 0 shares (Oliver Cert., Exs. N, S); and (4) a Westminster document entitled "Detail Cash Receipts by Date Paid," which appears to show that Westminster received $2350 from Hobbs Melville on November 29, 2000.  (Oliver Cert., Ex. Z.)

The Special Situations plaintiffs have not demonstrated that no material issues of fact exist that Westport or Westminster underwrote the 2000 Offering.  To be sure, the plaintiffs have provided more evidence to demonstrate Westport and Westminster participated in the offering

-15-

NOT FOR PUBLICATION

than they did with regard to Girard.  But viewing that evidence in the light most favorable to Westport and Westminster, the Court concludes that the plaintiffs have not met their burden. The nature and extent of Westminster's and Westport's involvement in the 2000 Offering remains ambiguous because the plaintiffs are unable to point to particular actions these defendants took to facilitate the offering.  The plaintiffs have not demonstrated that a reasonable jury would be compelled by plaintiffs' evidence to find that Westminster or Westport participated in the 2000 Offering.  Summary judgment on this issue is denied.

### 3.  Paulson and Oberweis

The Special Situations plaintiffs argue that Paulson and Oberweis were underwriters of the 2000 Offering because they purchased and sold Suprema shares to the public.

The plaintiffs introduced several documents, in addition to the Prospectus and Underwriting Agreement, relating to Paulson and Oberweis.  With respect to Paulson they introduced: (1) an undated copy of the "Agreement Among Underwriters," signed by Tracy H. Parker for Paulson (Oliver Cert., Ex. D); (2) a signed July 18, 2000 letter from Tracy Parker of Paulson to Hobbs Melville wherein she expresses Paulson's interest in participating in the offering[10] (Oliver Cert., Ex. K); (3) an August 24 and August 25, 2000 facsimiles from Hobbes Melville to Paulson stating that Paulson's final underwriting participation is 75,000 shares and its

---

[10]Specifically, Parker writes: "I would like to raise our indication of interest in Suprema Specialties to 37,000 shares.  We would also be interested in participating as an underwriter for up to $500,000. [. . . ] We appreciate any consideration you can give us in this offering and look forward to working with you."  (Oliver Cert., Ex. K.)

**NOT FOR PUBLICATION**

final retention amount is 35,000 shares[11] (Oliver Cert., Exs. M, P); (4) trade tickets and order confirmations produced by Paulson which appear to demonstrate that Paulson purchased 35,000 shares of Suprema stock at $7.60 per share on August 25, 2000 and that Paulson's clients in turn purchased or ordered 35,000 shares of Suprema stock at $8 per share, the offering price[12] (Oliver Cert., Ex. T); (5) an August 28, 2000 letter from Hobbs Melville to Paulson which appears to show that Paulson is to pay Hobbs Melville $266,000 on August 30, 2000 for 35,000 Suprema shares purchased at $7.60 per share (Oliver Cert., Ex. V); and (6) a November 20, 2000 letter from Hobbes Melville to Paulson stating that a check for $2,350.00 was enclosed with the letter and represents Paulson's underwriting fee for its participation in the Suprema offering.  (Oliver Cert., Ex. X.)

With regard to Oberweis, the plaintiffs have introduced: (1) an undated copy of an identical "Agreement Among Underwriters," signed by James W. Oberweis, the president of Oberweis.net (Oliver Cert., Ex. E); (2) an August 24, 2000 facsimile from Hobbes Melville to Oberweis stating that Oberweis's final underwriting participation is 75,000 shares and its final retention amount is 70,000 shares[13] (Oliver Cert., Ex. Q); (3) an account summary produced by Oberweis which shows that on August 30, 2000 Oberweis purchased 70,000 Suprema shares at $7.60 per share and sold 70,000 Suprema shares at $8 per share (Oliver Cert., Ex. U); (4) an

---

[11]A handwritten note on this letter reads: "All sold clear DTC 221 PAUL Thank you!" (Oliver Cert., Ex. M.)

[12]Some of the tickets and orders are dated August 25, 2000, and others are not dated.

[13]A handwritten note on this letter reads: "All sold clear DTC 221 PAUL Thank you!" (Ex. M.)

NOT FOR PUBLICATION

August 28, 2000 letter from Hobbs Melville to Oberweis which appears to show that Oberweis is to pay Hobbs Melville $266,000 on August 30, 2000 for 70,000 Suprema shares purchased at $7.60 per share.  (Oliver Cert., Ex. W.)

On the basis of the evidence listed above, the Court finds that the plaintiffs have met their burden and shown that there exists no genuine, material issue of fact that Paulson and Overweis acted as underwriters by selling Suprema shares to the public during the course of the 2000 Offering.  Neither Paulson nor Oberweis responded to or introduced any opposing evidence or otherwise responded to the plaintiffs' motion for summary judgment.  Accordingly, the Court grants summary judgment to the Special Situations plaintiffs against Paulson and Oberweis on this issue.


**II. Liability cap under section 11(e) of the Securities Act**

The Special Situations plaintiffs also ask the Court to rule that, as a matter of law, "Section 11(e) of the Securities Act limits the principal liability of the 2000 Underwriter Defendants to the value of the shares each of them underwrote in the 2000 Offering, or to the value of the shares each personally sold."  (Pls.' Br. at 2.)

Section 11(e) of the Securities Act limits the liability of each underwriter.  The express language of the statute does not require that the liability of any underwriter be limited to the total price of the shares which that particular underwriter distributed to the public:

> In no event shall any underwriter (unless such underwriter shall have knowingly received from the issuer for acting as an underwriter some benefit, directly or indirectly, in which all other underwriters similarly situated did not share in proportion to their respective interests in the underwriting) be liable in any suit or as a consequence of suits authorized

-18-

NOT FOR PUBLICATION

under subsection (a) of this section for damages in excess of the total price at which the securities underwritten by him and distributed to the public were offered to the public.

15 U.S.C. § 77k(e).

Courts interpreting this statute have found that it does not limit the liability of any defendant to the number of shares that particular underwriter distributes to the public. They have instead concluded that an underwriter is potentially liable for damages up to the total price of the security he underwrote, so long as that amount is not greater than the total amount distributed in the offering. As example, in a case before the Northern District of Illinois, certain underwriters had agreed to underwrite 1,145,000 shares of stock in a public offering but sold only 93,000 of those shares; the remainder were sold by the lead underwriter. In re: Sec. Am. Corp., 1985 WL 2266, at *1. These underwriters sought summary judgment to "limit their liability to the total price at which the securities they underwrote were sold by them to the public." Id. The court analyzed the policy underlying section 11, and reasoned that:

> Underwriter Defendants seek to circumvent the clear language of the statute by grafting the first provision of subsection 11(e) onto the provisions directly limiting underwriters' liability. . . . In capping the measure of damages by the price at which the security was offered to the public, Congress insured that defendants under § 11 would not be liable for damages attributable to subsequent market activity. While that provision by implication limits the liability of all underwriters to the total aggregate offering price of shares sold, it does not operate as an express limit on the exposure of individual defendants. In consequence, the phrase 'underwritten by him' does not already incorporate the requirement that those shares be sold, and the phrase 'distributed to the public' needn't be interpreted with reference to the particular underwriter to avoid meaningless surplusage.

Id. at *2.[14] On this basis, the court denied the motion for summary judgment and held that the

---

[14]The Northern District of Illinois characterized contrary language in two California cases, In re Itel Sec. Litig., 89 F.R.D. 104, 111 (N.D. Cal. 1981) and In re Gap Stores Sec. Litig., 79 F.R.D. 283, 298 (N.D. Cal. 1978), as "dicta" and "unpersuasive." 1985 WL 2266, at *3. This

NOT FOR PUBLICATION

liability of an individual underwriter "would be measured by the number of securities underwritten by that person, regardless of who distributes them."  Id.  Similarly, in Harden, the Seventh Circuit found that the liability of a "qualified independent underwriter," which had distributed no notes to the public, was unable to limit its liability to zero under section 11(e).  65 F.3d at 1404.[15]

The Court finds that, as a matter of law, section 11(e) of the Securities Act does not limit the liability of an underwriter to the shares that particular underwriter personally distributed to the public.[16]

## CONCLUSION

The Court denies the plaintiffs' motion for summary judgment that defendants Girard, Westport, and Westminster are underwriters as defined by section 2(11) of the Securities Act.

---

Court agrees with that characterization.

[15]Instead, the court in Harden reasoned that a qualified independent underwriter had "incurred section 11 liability with respect to the entire distribution."  This was because it had performed its "protective function," and thus underwritten, the entire debt issue."  65 F.3d at 1404.  The Court makes no finding of whether the Seventh Circuit's reasoning as to qualified independent underwriters is applicable here.

[16]In their filings, the plaintiffs also state that "[b]ecause, at a minimum each of the 2000 Underwriter Defendants underwrote that portion of the 2000 Offering formally allocated to it as represented in the Prospectus, the 2000 Underwriter Defendants are liable for at least the principal amount of $600,000 each [75,000 shares at $8 per share] even if they sold no shares." (Pls.' Br. at 3.)  To be clear, this ruling does not address either of these contentions.  First, the Court has not found that the plaintiffs have proved that each of the five underwriters underwrote 75,000 shares of the 2000 Offering.  Second, section 11(e) establishes the damage cap for each underwriter, not the minimum amount for which that underwriter is liable.

**NOT FOR PUBLICATION**

The Court grants the plaintiffs' motion for summary judgment that defendants Paulson and

Oberweis are underwriters as defined by section 2(11) of the Securities Act.  The Court grants

the plaintiffs' motion for summary judgment that, as a matter of law, section 11(e) of the

Securities Act does not limit the liability of an underwriter to the price of the shares that

particular underwriter personally distributed to the public.


August 2, 2007

**s/ William H. Walls**
United States Senior District Judge
